IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

STACY R. PLATTER,

        Plaintiff,

    v.                                     Civil Action No. 1:10-CV-147

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION THAT BOTH MOTIONS FOR SUMMARY
JUDGMENT BE DENIED AND THE CASE BE REMANDED**

**I. Introduction**

A.    <u>Background</u>

      Plaintiff, Stacy R. Platter, (hereinafter "Claimant"), filed her Complaint on September 16,

2010, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by

Defendant, Commissioner of Social Security, (hereinafter "Commissioner").[1] Commissioner

filed his Answer on December 17, 2010.[2] Claimant filed her Motion for Summary Judgment on

February 11, 2011.[3] Commissioner filed his Motion for Summary Judgment on March 14,

2011.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Memorandum in Support of Motion for Summary Judgment</u>.

---

[1] Dkt. No. 1.

[2] Dkt. No. 9.

[3] Dkt. No. 15.

[4] Dkt. No. 20.

2.      Defendant's Brief in Support of His Motion for Summary Judgment.

C.      Recommendation

For the following reasons, I recommend that:

1.      Both Motions for Summary Judgment be **DENIED** and the case be remanded to Commissioner.  While the issue of disability is reserved to the Commissioner, the ALJ needed 1) to make more specific findings about Claimant's statements as to which past work requirements could no longer be met and 2) obtain sufficient information on Claimant's past work to permit a decision as to Claimant's ability to return to such past work.

## II.  Facts

A.      Procedural History

Claimant filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging disability due to Crohn's disease and chronic pain in her shoulder, neck and back with an onset date of September 15, 2005 (Tr. 75, 79).  The application was initially denied on August 24, 2007, and on reconsideration on October 18, 2007. (Tr. 79, 84, 95, 98).  Claimant requested a hearing before an Administrative Law Judge (hereinafter "ALJ") on November 20, 2007, and received a hearing on December 23, 2008 before the ALJ in Morgantown, WV. (Tr. Tr. 11-59, 104).  Claimant was represented by counsel at the hearing.

On March 5, 2009, the ALJ issued a decision adverse to Claimant finding that Claimant had not been under a disability within the meaning of the Social Security Act from September 15, 2005 through the date of this decision. (Tr. 63).  Claimant requested review of the ALJ's decision by the Appeals Council on March 24, 2009, but such review was denied on April 27,

2010. (Tr. 6, 140). Claimant filed this action, which proceeded as set forth above, after exhausting her administrative remedies.

B.      Personal History

        Claimant was born on December 11, 1969, and was thirty-five (35) years old on the onset date of the alleged disability and thirty-nine (39) years old as of the date of the ALJ's decision. (Tr. 177). Under the regulations, Claimant was considered a "younger individual" under the regulations, and generally, one whose age will not "seriously affect [Claimant's] ability to adjust to other work." 20 C.F.R. §§ 404.15639(c), 416.963(c). Claimant has a high school diploma and has a business college degree in computer technology (Tr. 207). Claimant has prior work experience as a bakery worker, maid, and auto auction driver. (Tr. 200).

C.      Medical History

        The following medical history is relevant to the issues of whether substantial evidence supports the ALJ's finding that Claimant could perform a range of work at the light exertional level.

        Claimant was seen at the WVU Department of Medicine on September 27, 2005 complaining of abdominal pain. (Tr. 351). Claimant stated that she was diagnosed with Crohn's Disease in 2004 and Claimant was prescribed Asacol. (Tr. 351). Claimant became unable to afford the medicines, however, but recently was able to obtain some Asacol and "noted a very big improvement from [Claimant's] previous symptoms." (Tr. 351). Claimant noted that "the pains that had been bad in the past are currently occurring maybe once a week and not disturbing her too much." (Tr. 351). Claimant smokes one pack of cigarettes a day. (Tr. 351). Claimant did not report any arm or leg numbness. (Tr. 352). The physician diagnosed Claimant with Crohn's

disease with ileo-ileal fistula on small bowel follow through. (Tr. 352).

Claimant was seen at the WVU Department of Orthopaedics on December 19, 2005 for injuries related to Claimant's auto accident. Claimant was referred to this office for possible disc herniation with impingement of Claimant's nerve roots. (Tr. 349). Claimant's past medical history was noted as "significant for Crohn's Disease." (Tr. 349). Claimant smokes 1-2 packs of cigarettes a day for the past 15 years. (Tr. 349). Claimant complained of chronic diarrhea from her Crohn's disease and neck and right shoulder pain. (Tr. 349). While Claimant was noted as having decreased range of motion in extension and right and left rotation secondary to pain, Claimant's flexion was intact. (Tr. 350). Claimant was offered an injection to aid with Claimant's right shoulder tendonitis but Claimant stated "she does not want this secondary to her fear of needles." (Tr. 350). Claimant wanted to try physical therapy first. (Tr. 350).

Claimant's medical records from Tygart Valley Rehabilitation & Fitness dated from December 29, 2005 to March 30, 2006 are also relevant. Claimant was noted as having a loss of range of motion and ongoing pain in her right shoulder. (Tr. 393-94). Claimant reported temporary relief from physical therapy sessions lasting approximately 1 hour, however, Claimant still suffered from an impaired shoulder and decreased range of motion. (Tr. 395, 398, 399). Claimant also complained of feeling "pins and needles" shooting down her arm for about five minutes. (Tr. 397). Claimant was also noted as having impaired cervical range of motion. (Tr. 401).

Emergency department records from Grafton City Hospital from 2006 indicate Claimant was diagnosed with "right shoulder pain/rotator cuff/cervical strain." (Tr. 270-272). The findings of a CT of Claimant's pelvis, dated December 18, 2006, note that Claimant may have an

infected ureteral remnant extending from the umbilical region to the superior aspect of the bladder. (Tr. 273). The CT also suggested Claimant suffered from bilateral adnexal cysts with no significant free fluid. (Tr. 273).

Claimant's medical records from WVU Hospitals dated January 5, 2007 to April 7, 2008 are relevant. On January 7, 2008 Claimant presented as a pre-operation checkup for surgery that was occurring on the same day. (Tr. 403). Claimant was noted as having severe anemia, Crohn's disease and enterovesticular fistula. (Tr. 403). Claimant also had abdominal pain, diarrhea, a headache and lumbar pain. (Tr. 404). On January 8, 2007, Claimant was again seen for preadmission for surgery. (Tr. 407). Claimant was required to come in for a transfusion and for blood in Claimant's urine. (Tr. 407). Claimant was noted to have a fistula and chronic pain. (Tr. 407). Claimant was again diagnosed with Crohn's disease, anemia, and a chronic UTI. (Tr. 410). Other than the above-mentioned symptoms, Claimant was asymptomatic. (Tr. 410).

Claimant underwent surgery on January 15, 2008 for a takedown of a ileovesical fistula. (Tr. 418, 423). On a physical therapy evaluation on January 18, 2008, Claimant's strength in her left and right shoulder, elbow, wrist/hand, hip, knee and foot/ankle were rated at a strength level of at least 3 out of 5. (Tr. 413). Claimant "refused to get out of bed" at the time of the assessment. (Tr. 414). On April 7, 2008, Claimant was noted to have "essentially near complete resolution of the small bowel wall thickening when compared to the previous examination." (Tr. 443). There was no air or contrast seen within the vagina or the bladder to definitely suggest fistula formation to either of these structures but the physician recommended clinical correlation. (Tr. 443). The physician also noted distention of the gallbladder lumen and resolution of the bilateral ovarian cysts with 1 residual small irregularly contoured cystic mass in the right ovary.

(Tr. 443).

Claimant was admitted to Grafton City Hospital on September 25, 2008 for an MRI of her cervical spine. (Tr. 454). The results demonstrated a normal contour of Claimant's spinal cord and normal alignment of the cervical spine with preserved vertebral body height, contour and signal intensity. (Tr. 455). A small left paracentral disc herniation at C6-7 with mild left neural foraminal encroachment was noted but no spinal stenosis was found. (Tr. 455). A CT of Claimant's pelvis taken suggested an infected ureteral remnant extending from the umbilical region to the superior aspect of the bladder. (Tr. 461).

On January 5, 2007, physician's assistant, Mary Helen Hess stated that Claimant "smokes a pack of cigarettes a day for the last 16 years." (Tr. 347). Claimant was noted to have frequency and abdominal pain but denied any dysuria. (Tr. 347). Claimant's medications include Asacol two tablets three times a day and Lorcet for pain. (Tr. 347).

Medical records from Monongalia General Hospital dated March 19, 2007 stated Claimant presented that day complaining of right leg pain-swelling for the week prior. (Tr. 301). Claimant was noted as having Crohn's Disease and that she was a smoker and "uses tobacco regularly." (Tr. 301). Claimant also presented on this date at Taylor County Medical Center complaining of achiness, pain and being tired all the time. (Tr. 491). Claimant indicated that she "had been taking a lot of Advil recently, as many as 16-20 a day everyday for the last several weeks if not a few months" and that "she knows that she has probably overdone it" but that is the only thing that helps with Claimant's right shoulder pain. (Tr. 491).

Medical records from Monongalia General Hospital dated March 20, 2007 indicate Claimant told doctors that she was diagnosed with Crohn's disease in 2004 and has been taking

6

Asacol 800 mg three times daily since that time. (Tr. 287).  Claimant was "positive for tobacco use." (Tr. 288).  Claimant also reported "stool-like vaginal discharge occurring 50% of the time with bowel movements and reported frequency, urgency, nocturia 2-3x a night occurring in the past 6-7 months." (Tr. 294).  Claimant reported she "smokes a pack of cigarettes a day and has smoked for 16 years." (Tr. 295).  Claimant was recommended to consult with a gastroenterologist. (Tr. 296).  Claimant's impression was as follows: 1) Crohn's Disease with colovaginal and probable colourinary fistula; 2) microcytic hypochromic anemia; 3) chronic back and right shoulder pain with non-steriodal anti-inflammatory drug use. (Tr. 296).

Inpatient records from Monongalia General Hospital dated March 21, 2007 list Claimant's discharge diagnosis as 1) anemia due to gastrointestinal blood loss and 2) Crohn's Disease. (Tr. 283).  Claimant presented on March 20, 2007 with right lower leg swelling and was found to have a low hemoglobin. (Tr. 283).  CT scans showed a wall thickening over a 20-50 cm length at mid ileum, increased fluid, air and soft tissue element over a 3-4 cm area abutting the right rectum. (Tr. 283).  Additionally it showed there was a rectus abdominus fistulous communication involving the anterior-superior urinary bladder and mid ileum and a possible cyst and fluid accumulation. (Tr. 283).  Surgery was discussed and Claimant was also found to have a urinary tract infection. (Tr. 283).  Claimant "wanted to go against medical advice, and despite telling them that this was potentially life-threatening to them, they understood the consequences." (Tr. 283).

Claimant's medical records from Physicians Office Center dated March 27, 2007 recount Claimant's previous visits to that office.  The physician noted Claimant was seen "in this clinic in September 2005 at which time we reviewed her records and agreed with likely diagnosis of

Crohn disease." (Tr. 345). The physician discussed the necessity of Claimant to undergo more aggressive therapy in addition to Asacol "which the [Claimant] did not follow." (Tr. 345). Claimant stated she was started on Cipro, which "greatly helped with her abdominal pain." (Tr. 345). Claimant "states that she is currently being maintained on Asacol two tablets three times a day in addition to Cipro 500 mg b.i.d." (Tr. 345).

On April 4, 2007, Claimant presented at Taylor County Medical Center requesting pain medication for right leg pain and knots in her leg. (Tr. 492). Claimant was observed to be in no acute distress but there was some mild deformity of the pretibial area with the pretibial lesion. (Tr. 492). Claimant was advised against using any NSAIDs "as this may worsen her Crohn's disease in light of [Claimant's] recent GI bleed." (Tr. 492).

Claimant's medical records from Ruby Memorial Hospital, dated April 18, 2007, illustrate that Claimant underwent a colonoscopy and biopsy. (Tr. 341). The examination revealed an anterior fissure and a single aphthoid-type ulcer in the sigmoid colon. (Tr. 341). Claimant was advised to follow up with Dr. Coebel for the results of Claimant's pathology and Claimant's continued care. (Tr. 341).

On April 25, 2007, Claimant went to Taylor County Medical Center stating that her Ultram is not working and that she continues to have aches and pains all over, throughout the day, mostly over her right shoulder and neck. (Tr. 493). Claimant was noted as stating "she feels limited by her Crohn's disease" and "feels she has no energy and part of this is due to her poor sleep." (Tr. 493). Claimant was encouraged to "get out and do some activity every day, to walk, play frisbee, anything really that will get her more active." (Tr. 493). The physician "encouraged [Claimant] to make sure that the house has plenty of sunlight, to do things during

the day to try and help her develop some better physical conditioning which [the physician] thinks her inactivity is causing her to have stiffness and pain." (Tr. 493).

Claimant was examined on May 5, 2007 by Dr. Ostrinsky who discussed the results of Claimant's colonoscopy. (Tr. 343). Dr. Ostrinsky stated Claimant had a suspected ileovesical fistula. (Tr. 343). Claimant was instructed to continue her Asacol two tablets three times a day and biological therapy was discussed. (Tr. 343).

On June 11, 2007, Claimant went to Taylor County Medical Center out of concern that she has a urinary tract infection. (Tr. 495). Claimant was "very up front about saying that she does not want to be on any controlled medicines or medicines that may addict her as she has a sister who has gone through this and it is something she does not want." (Tr. 495). The physician noted that Claimant was suffering from a urinary tract infection and that it was "likely chronic and definitely a possibility if [Claimant] does, in fact, have a fistula." (Tr. 495).

A disability determination examination of Claimant was performed by Dr. Thimmappa on August 16, 2007. (Tr. 354). Claimant was noted as having chronic pain in her neck and right shoulder and suffers from Crohn's disease. (Tr. 354-55). Claimant "does smoke one pack of cigarettes daily for 12 years and gets frequent urinary tract infections." (Tr. 355). Claimant walks and squats normally. (Tr. 355).Claimant is able to write, pick up a coin normally, speak and communicate normally. (Tr. 355). Claimant completed one year of college. (Tr. 355). Claimant's movements were normal. (Tr. 356).

A physical residual functional capacity assessment was performed by Dr. Cindy Osborne on August 21, 2007. (Tr. 360). Claimant's exertional limitations were noted as follows: 1) can occasionally lift and/or carry (including upward pulling) a maximum of 20 pounds; 2) can

frequently lift and/or carry (including upward pulling) a maximum of 10 pounds; 3) can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; 4) can sit (with normal breaks) for a total of about 6 hours in an 8 hour workday; 5) can push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 361). Claimant's postural limitations were as follows: 1) can frequently balance; 2) can occasionally climb ramp/stairs, stoop, kneel, crouch and crawl; 3) can never climb ladders, ropes or scaffolds. (Tr. 362). No manipulative, visual or communicative limitations were established. (Tr. 364). Claimant's environmental limitations were as follows: 1) can have unlimited exposure to noise and vibrations; 2) should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. 364). Dr. Osborne stated Claimant's "complaints are mostly credible but do not meet or equal any listing." (Tr. 367). Dr. Osborne opined that Claimant's RFC should be decreased to light with limitations as previously indicated. (Tr. 367).

On September 18, 2007, Claimant went to University Health Associates. Claimant's colonoscopy done in April 2007 showed "some Crohn's colitis at the terminal ileum." (Tr. 370). Considerable irregularity and areas of narrowing of the distal ileum consistent with the patient's history of Crohn disease was shown. (Tr. 370). Claimant was noted as stating her "disease process and her symptoms have significantly improved" in that Claimant still suffers from constant diarrhea but "now it is more solid in consistency." (Tr. 370). Claimant's nocturnal diarrhea "is much more improved than before." (Tr. 370). "Claimant still complains of occasional stool in her urine but states that it is probably 50% better than before." (Tr. 370). Claimant "still has abdominal pain and tenderness on the lower quadrants of her abdomen but it

is better than what it used to be prior to starting her current therapeutic regimen." (Tr. 370).

Claimant "does have back pain that she attributes to a motor vehicle accident." (Tr. 370).

"Although the [Claimant's] have improved, she is still anxious about her fistula. She has not

seen a urologist. She was told to see a urologist in the past and was actually scheduled for a

urological visit." (Tr. 370). Claimant's assessment by the doctor was as follows:

> this 37-year-old Caucasian woman with a history of enterovesicular
> fistulizing Crohn's disease now clinically better with her current
> therapeutic regimen of Imuran 100 mg by mouth daily and Asacol,
> 3,200 mg by mouth daily now." (Tr. 371)." "Obviously, clinically
> stable with moderate improvement albeit not fully. She does still have
> her enterovesicular fistula that needs to be looked at. Biological
> therapy as far as Humira and Remicade have been shown to mitigate
> enterovesicular fistulas. At this point, she is very averse of needles
> and this will be a problem in the future if we decide to start her on
> any biologicals. The fact that the [Claimant] responded well to her
> current therapeutic regimen suggests a better prognosis.

(Tr. 371).

Claimant was also seen on October 2, 2007 by University Health Associates. Claimant was there

for further evaluation and had been having gross hematuria, bladder infections and air through

her urethra. (Tr. 368). Claimant was assessed as having an enterovesical fistula. (Tr. 368). The

doctor noted that Claimant would undergo a cystoscopy with possible biopsy and cisternogram

to evaluate the question of the fistula. (Tr. 368).

On October 11, 2007, Claimant went to Taylor County Medical Center for her three

month follow up. (Tr. 497). Claimant "states she is miserable" and "approximately two weeks

ago she had an episode of passing a lot of blood and clots however she refused to seek medical

care at that time." (Tr. 497). Claimant "notes she is still having a lot of pain primarily in her

right shoulder, radiating up to her neck and causing headaches" and "has been taking the

tramadol" but Claimant states "it really does not seem to work and she is scared to take anything else for fear of exacerbating her Crohn's." (Tr. 497).

A physical residual functional capacity assessment was performed by Dr. Thomas Lauderman on October 18, 2007. (Tr. 372).  Claimant's primary diagnosis was Crohn's disease with a secondary diagnosis of neck and shoulder arthralgias. (Tr. 372).  Claimant's exertional limitations were as follows: 1) can occasionally lift and/or carry (including upward pulling) a maximum of 20 pounds; 2) can frequently lift and/or carry (including upward pulling) a maximum of 10 pounds; 3) can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; 4) can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; 5) can push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 373).  Claimant's postural limitations are as follows: 1) can occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch and crawl. (Tr. 374).  No manipulative, visual or communicative limitations were established. (Tr. 375-376).  Claimant's environmental limitations were as follows: 1) can have unlimited exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation; 2) should avoid concentrated exposure to extreme cold and heat and hazards. (Tr. 376).  Dr. Lauderman stated "Claimant is partially credible since the medical evidence does not substantiate the Claimant's allegations to the degree alleged." (Tr. 379).

According to University Health Associate medical records, Claimant was sent as a consult due to her Crohn's disease with enterovesical fistula. (Tr. 476).  Claimant's medical history was recounted as follows: Claimant was diagnosed with Crohn's disease approximately 4-5 years ago and was started on Asacol. (Tr. 476).  Claimant did not follow up with a physician

for three to four years and finally established care with Dr. Stefan Goebel at WVU. (Tr. 476). Claimant complains that the pain in her lower abdomen is sharp, like being cut with a knife and it is continuous. (Tr. 476). Claimant stated she "has a bowel movement twice a day, which [Claimant] describes as her norm." (Tr. 476). Claimant's diagnosis was a terminal ileal Crohn's disease for which the physician suggested a laparoscopic-assisted terminal ileal resection with takedown of the fistula. (Tr. 477). Claimant's physician noted that Claimant "continues to be reluctant to institute therapy with biologicals" but that Claimant "should seriously consider this." (Tr. 478).

On a January 31, 2008 post-operative checkup with University Health Associates, Claimant was noted to have self-medicated with Imuran, "which was not advised" and the physician "advised [Claimant] to discontinue" that medication. (Tr. 475). On February 25, 2008, Claimant presented at University Health Associates for a follow up for her Crohn's disease and a check up after her recent surgery. (Tr. 472). Claimant was prescribed Questran powder to help with Claimant's stool problems. (Tr. 473). On August 26, 2008, Claimant went to University Health Associates. On exam, Claimant was alert and oriented and was in no acute distress. (Tr. 467). Claimant was doing well enough that the doctor stated "we will just see [Claimant] on a yearly basis." (Tr. 467). On September 30, 2008 Claimant was again referred to University Health Associates for a possible fistula. (Tr. 465, 469). Claimant was noted as stating that her "condition is severely interfering with her daily activities and her quality of life and wants to have a definitive diagnosis and possible surgical repair." (Tr. 466).

On February 27, 2008, Claimant presented at Taylor County Medical Center for a two month follow up appointment. (Tr. 500). Claimant had recently had a partial colectomy and

partial bladder resection for a enterovesical fistula. (Tr. 500). Claimant continues to have frequent diarrhea multiple times a day and continues to have urinary frequency but no dysuria anymore. (Tr. 500). Regarding Claimant's medications, Claimant continues to take Lortab and Claimant "feels this is doing an adequate if not ideal job of controlling her neck and back pain and abdominal pain." (Tr. 500). Claimant was also noted to have anxiety and depression, secondary to her Crohn's disease. (Tr. 501). Claimant was started on Klonopin but if Claimant's symptoms persist beyond two months, the physician indicated he would discontinue the Klonopin long term. (Tr. 501). Claimant's physician thought that "with improvement in her Crohn's disease that [Claimant] may not need [additional medication] and that Claimant's stress is really more situational than chronic depression or anxiety." (Tr. 501).

D.    Testimonial Evidence

Testimony was taken at the hearing held on December 23, 2008. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified at the hearing that she graduated from high school and attended a business college for nine months where she gained training in the computer technology field. (Tr. 19). Claimant stated she previously worked as a cookie decorator and a driver for an auction service where she, at one time, had to change tires as needed. (Tr. 20-21). Claimant also testified that she last worked in September 2005 due to an auto accident which occurred while Claimant was working as a driver. (Tr. 22-23). Claimant testified that she injured her back and shoulder in the auto accident and that she still suffers from a herniated disc, headaches, and shoulder and arm problems. (Tr. 24). Claimant received Worker's Compensation from her work-related accident up until "January or February of 2007." (Tr. 24).

Regarding her neck pain, Claimant testified that she has "a dull, constant pain" in her neck and that she cannot do any "major twists or turns." (Tr. 24). Claimant stated her ability to turn her head left to right has decreased and that the weather affects her neck pain. (Tr. 24-25). Claimant also testified that she suffers from headaches approximately three times a week that last in duration from two minutes to a few hours. (Tr. 26). Claimant also testified that she still suffers from shooting pain in her right shoulder and arm. (Tr. 27). This pain is brought on, Claimant believes, whenever Claimant does "too many things with [her] hands or [her] arms." (Tr. 27). Claimant was not being treated for the problems related to her neck, shoulder or hand at the time of the hearing. (Tr. 27). Claimant testified that her primary care physician, Dr. Bender, referred Claimant to a pain clinic in Morgantown, WV. (Tr. 28). Claimant stated the pain clinic physician Claimant was seeing wanted to "try me on an anti-depressant" but Claimant stated her previous use of anti-depressants made her "spacey" and did not decrease Claimant's pain. (Tr. 28).

Claimant indicated she was diagnosed with Crohn's Disease in 2002. (Tr. 29). Claimant initially was medicated with Asacol with Claimant stated helped "somewhat." (Tr. 29-30). Claimant also self-medicated with Imodium to help with Claimant's abdominal cramping. (Tr. 30). Claimant testified her Crohn's Disease interfered with her work as a driver at the auto auction because she "had to take quite a few Imodium to be able to get to and from where I needed to go" and that there were times when Claimant would have to take time off or decline certain driving opportunities. (Tr. 30). Claimant stated her symptoms from Crohn's Disease started to worsen approximately six months to a year after Claimant's auto accident when she developed an abscess which erupted. (Tr. 30). Claimant described her symptoms from Crohn's

disease as follows: "severe abdominal pain, cramping, bad diarrhea, frequent trips to the bathroom...and a constant urinary tract infection." (Tr. 31). Claimant underwent surgery in 2008 to remove the fistula between her small intestine and bladder. (Tr. 30-31).

Claimant testified that after the 2008 surgery, she still suffered from abdominal pain and chronic diarrhea but that the stomach pain was not as intense as before. (Tr. 32). Claimant has "good" and "bad" days regarding her bathroom tendencies. Claimant testified that on a "good" day, Claimant goes to the bathroom twice an hour and on a really "bad" day, Claimant goes to the bathroom up to six times in an hour. (Tr. 33). Claimant indicates that her urgency to go to the bathroom as vastly increased since the 2008 surgery. (Tr. 33). Claimant testified that she takes Questran which helps to decrease Claimant's urgency to go to the bathroom as well as diarrhea. (Tr. 34). Questran, Claimant stated, sometimes causes Claimant to become nauseated. (Tr. 34).

Claimant testified she was unable to do normal household chores. (Tr. 35). Claimant stated she is able to do laundry with help but that Claimant tries "not to do much cooking." (Tr. 36). Claimant does not shop for groceries or clothes because she "can't walk for that long." (Tr. 36). Claimant is able to sit for approximately an "hour, hour and a half" before needing to move around due to pain in her neck and feet. (Tr. 37). Claimant testified she was able to stand for about thirty minutes and was able to walk on level surfaces for about a "half hour, forty minutes." (Tr. 37). Claimant stated she was able to lift approximately five pounds with both hands. (Tr. 37). Claimant also testified she drives "very rarely" because her "neck gets very stiff, and [her] back hurts really bad." (Tr. 38). Claimant stated she limits her eating and drinking consumption prior to doctor's appointments or similar activities and consumes

"anywhere from 80 to 100 Imodium" prior to leaving her house. (Tr. 38). Claimant testified she rarely visits with family or friends but that "maybe once every two or three months we may go to [Claimant's fiance's] sisters. (Tr. 38).

Claimant indicated that she did not seek treatment for three or four years after her diagnosis of Crohn's Disease because "it didn't really bother [Claimant] that much at the beginning." (Tr. 40). Claimant testified that she continued to smoke approximately a pack of cigarettes a day. (Tr. 40-41). Claimant stated the "only thing [Claimant] refused" was an injection into Claimant's spine but that Claimant was currently doing the exercises the physical therapist taught Claimant. (Tr. 43).

Claimant testified that she has previous work history as a bakery worker, fast food worker and as a bookkeeper. (Tr. 48-50). Mr. Larry Ostrowski, vocational expert (hereinafter "VE"), testified at Claimant's hearing regarding the skill and exertional level of some of Claimant's previous employment positions. The VE identified Claimant's job as a fast food work to be at a light and unskilled level. (Tr. 51). Claimant's positions as a bakery worker, deli cutter/slicer and cashier were classified at the light and unskilled level. (Tr. 51). Claimant's work as a telephone solicitor was characterized as sedentary and semi-skilled. (Tr. 51). Claimant's position as a bookkeeper was classified as sedentary and skilled while her work as a dishwaher was medium and unskilled. (Tr. 51). Claimant's position as a receptionist was sedentary and semi-skilled while her position as a driver was sedentary and unskilled. (Tr. 52). Claimant's job as a sales attendant was light and unskilled and Claimant's position as a cookie decorator was light and semi-skilled. (Tr. 52-53).

The ALJ posed the following hypothetical to the VE:

> Assume that [Claimant] has the residual functional capacity to perform the exertional work of light, as defined by statute, occasionally lift and/or carry 20 pounds frequently, lift and/or carry 10 pounds, stand and/or walk with normal breaks, for a total of about six hours in an eight [hour] work day, sit with normal breaks for a total of about six hours in an eight [hour] work day. For posturals, I want you to assume that [Claimant] could occasionally climb ladders, ropes and scaffolds, occasionally climb ramps and/or stairs, occasionally balance, stoop, kneel, crouch, and/or crawl. For environmental, I want you to assume that [Claimant] must avoid concentrated exposure to extreme cold and/or heat, avoid concentrated exposure to hazards, such as dangerous machinery and/or heights, etc.

(Tr. 54).

The VE testified that Claimant would be "able to do the work of a fast food worker, the work of a cashier at the bakery, the general ledger bookkeeping job, the deli cutter/slicer job, the cashier jobs, the receptionist work, sales attendant, and decorator." (Tr. 54-55). The ALJ then posed several other limitations to the VE, in addition to the previously-posed hypothetical:

> I want you to assume...that [Claimant] would need two additional breaks during an eight hour work day for bathroom and hygiene needs. With a break period of no more than ten minutes each, and possibly less.

(Tr. 55).

The ALJ then questioned the VE regarding whether Claimant would be able to perform her past work which was previously identified. The VE answered in the affirmative. (Tr. 55). The ALJ then posed a third hypothetical:

> I want you to assume that all the testimony you've heard today from [Claimant] would be deemed credible about her pain complaints and functional limitations. That [Claimant] has constant pain in her neck, with limited range of motion, especially from left to right. She has an average of three headaches a week that last at least an hour each at a time, if not more. She experiences shooting pain down her right shoulder to her fingers, with numbness and tingling. She's right-hand

18

dominant, and as a result of this pain and tingling, it's difficult for her to use her right hand. She has daily abdominal pain and cramping. She needs to make constant trips to the bathroom, at least once an hour. She can only sit for one hour at a time. She can only stand for only 30 minutes at a time. She can only walk 30-40 minutes at a time. And she can only lift a five pound bag of sugar at most. If you assume that all of these pain complaints and limitations are also supported by the objective medical evidence, would there be any occupations that [Claimant] could perform?

(Tr. 55-56).

The VE testified that there would be no occupations Claimant would be able to perform given the limitations in the third hypothetical. (Tr. 56). The ALJ then posed a fourth RFC to the VE:

I want you to assume the exertional level has changed to sedentary. And the I'd like you to assume the same RFC limitations as RFC number two, so that the posturals, environmental limitations identified in RFC number two, which include the two additional ten minute or less breaks during the eight hour work day are added to RFC number four. If you do that, would the past work that you've identified still exist in any way?

(Tr. 56).

The VE testified that Claimant would still be able to perform the work of a receptionist and as a general ledger bookkeeper. (Tr. 56). Claimant's attorney then asked the VE if the two breaks presented in hypothetical numbers two and four were unscheduled and occurred with little announcement, whether that would affect Claimant's ability to perform the listed occupations. (Tr. 57). The VE testified that it would "be more problematic" in some positions such as the cashier and fast food positions. (Tr. 57).

E.      Lifestyle Evidence

        The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how

Claimant's alleged impairments affect her daily life:

Claimant described her activities from the time she awoke until going to bed as follows:

> Lay in bed until able to get up. Take shower. Eat Lunch. May read or watch TV. Take nap. If weather is ok, may sit outside for ½ hour or so. Use restroom about 20-30 times. Eat dinner. Lay on couch. Watch TV. Take medications, go to bed.

(Tr. 217).

Claimant indicated she does not take care of anyone other than herself. (Tr. 218). Claimant states that her condition affects her sleep in that it is "hard to get comfortable," "difficult to stay asleep," and Claimant must "wake up a lot to use the bathroom." (Tr. 218). Claimant alleges she was able to do housecleaning, make meals and move around physically prior to her illness. (Tr. 218). Claimant's ability to do the following has not been affected by her illness: 1) dress (with the exception that Claimant "sometimes pulls muscles to put on shirts and bra), 2) care for her hair; 3) shave; 4) feed herself. (Tr. 218). Claimant does get dizzy when bathing and constantly uses the toilet due to her diagnosis of Crohn's Disease. (Tr. 218). Claimant does not need special reminders to take care of her personal needs and grooming but has created a list to help remind her of what medicines to take and when to do so. (Tr. 219). Claimant does not prepare her own meals because it is difficult for her to lift items and Claimant gets "dizzy and lightheaded standing for too long." (Tr. 219). Claimant does not do household chores because she cannot "move around to do them and also gets very dizzy and lightheaded easily." (Tr. 219-220).

Claimant goes outside 1 or 2 times a week by either driving or riding in a car. (Tr. 220). Claimant shops in stores for food and toiletries, although, at the time of filling out the form, Claimant indicated she had not been to the store in over 5 months. (Tr. 220). Claimant is able to

pay bills, count change, handle a savings account and use a checkbook/money order. (Tr. 220). Claimant's ability to handle money has not been affected by her illness. (Tr. 221). Claimant is able to engage in her hobbies of watching TV daily, and reading and doing puzzles about two to three times a week. (Tr. 221). Claimant does spend time talking with others on a daily basis and does not need to be reminded to go places. (Tr. 221). Claimant describes the changes in her social activities since her illness as follows: "can't go very many places because I can't walk very far, I get dizzy easily and go to the bathroom constantly." (Tr. 222).

Claimant indicated her illness affects the following abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing and using her hands. (Tr. 222). Claimant states that "moving around physically hurts after a few minutes, sitting makes [her] back and legs hurt," and Claimant "can lift very little (under 5 lbs) without dropping" items. (Tr. 222). Claimant estimates her ability to walk before needing to stop and rest between a range of 50 to 100 feet with Claimant requiring a 10-15 minute break before Claimant could resume walking. (Tr. 222). Claimant can pay attention for 1-2 hours and usually finishes what she starts. (Tr. 222). Claimant follows both written and spoken instructions well. (Tr. 222). Claimant gets along well with authority figures and has not been fired or laid off from a job because of problems getting along with other people. (Tr. 223). Claimant indicates she does not handle stress or changes in routine very well. (Tr. 223). Claimant has noticed, after her auto accident, that she was "very, very nervous riding in or driving a car." (Tr. 223). Claimant regularly uses eyeglasses that were prescribed by a doctor in September 2005. (Tr. 223).

## III. The Motions for Summary Judgment

A.  Contentions of the Parties

Claimant contends the ALJ's decision is not supported by substantial evidence because the information the ALJ based her decision on was false. Specially, Claimant argues "every page of the judge's 'findings of fact' contained false statements." See Pl.'s Summ. J. Mot., Pg. 2 (Dkt. 15) (emphasis in original). Claimant additionally asserts that the ALJ was biased in her decision because the ALJ's decision was "not based on facts." Id. at 3. (emphasis in original).

Commissioner argues to the contrary and contends substantial evidence supports the ALJ's finding that Claimant could perform her past relevant work. Specifically, Commissioner states that "the evidence showed that [Claimant] retained the ability to perform a limited range of light work that did not exceed the requirements of [Claimant's] past jobs." See Def.'s Summ. J. Mot., Pg. 12 (Dkt. 21). Commissioner argues the ALJ's residual functional capacity assessment was proper and accounted for all of the credible limitations caused by Claimant's Crohn's disease and herniated cervical discs. Id. Additionally, Commissioner contends Claimant's medical evidence is inconsistent with Claimant's allegations related to her Crohn's disease. With regards to Claimant's musculoskeletal complaints, Commissioner argues the unremarkable findings in Claimant's MRI and physical examination "do not support [Claimant's] allegations of extreme limitations resulting from her back impairment." See Def.'s Summ. J. Mot., Pg. 14 (Dkt. 21). Commissioner also highlights Claimant's noncompliance with treatment as support that Claimant's claims of extreme pain and limitations are not entirely credible. Id. Lastly, Commissioner argues substantial evidence supports the ALJ's decision to afford little weight to Dr. Bender's opinion that Claimant was disabled. Id. at 16.

B.    Discussion

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

1.    **Whether Substantial Evidence Supports Finding that Claimant Can Perform Past Relevant Work**

Claimant argues she is disabled and "not able to work in any capacity." See Pl.'s Summ. J. Mot., Pg. 1 (Dkt 15). Claimant contends her medical records stated that she was "unable to work in any capacity" and that the "occupational expert at [Claimant's] hearing told the [ALJ] that there was no employment [Claimant] was capable of due to [Claimant's] health. Id. Claimant additionally alleges the ALJ's decision contained "so many lies." See Pl.'s Summ. J. Mot., Pg. 2 (Dkt. 15).

In opposition, Commissioner argues that "because [Claimant's] subjective complaints were inconsistent with the medical evidence, [Claimant's] lack of compliance with treatment, and Dr. Lauderman's opinion that [Claimant's] allegations were unsupported by the record, the

ALJ reasonably found that [Claimant's] complaints were not fully credible." See Def.'s Summ. J. Mot., Pg. 15 (Dkt. 21).

In the fourth stage of the sequential evaluation, the Claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally. Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003). A claimant is not disabled if she can perform her past relevant work, either as she actually performed it or as it is generally performed in the national economy. See SSR 82-61, 1982 SSR LEXIS 31; see also Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981) (noting that "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally.") While the Claimant bears the burden of proving an inability to perform past relevant work, "the Commissioner has the duty to adequately inquire into the demands of a claimant's past relevant work so that a correct decision can be reached as to claimant's ability or inability to perform it." Wood-Monroe v. Astrue, No. 05-cv-1570, 2008 U.S. Dist. LEXIS 110596 (N.D.N.Y. Sept. 16, 2008).

Determination of the claimant's ability to do past relevant work requires a careful appraisal of 1) the individual's statements as to which past work requirements can no longer be met; 2) medical evidence establishing how the impairment limits [claimant's] ability to meet the physical and mental requirements of the work; and 3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles* on the requirements of the work as generally performed in the economy." "The decision as to whether the claimant retains the functional capacity to perform past work...has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an

important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." SSR 82-62, 1982 SSR LEXIS 27.

The ALJ erred as a matter of law when she failed to develop the record regarding the physical and mental demands of Claimant's past relevant work. The ALJ relied on the testimony of the vocational expert in her findings regarding the physical and mental demands of Claimant's past relevant work. In making findings regarding the physical and mental demands of a Claimant's past relevant work, however, the ALJ must assess details of the job's demands, including strength, endurance, manipulative ability and mental requirements. SSR 82-62, 1982 SSR LEXIS 27. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source. Id. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." Id. The ALJ has a duty to explore any vocational inconsistencies that are apparent at the time of hearing. Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008). The Court concludes that the ALJ should have inquired more specifically into the physical and mental demands of Claimant's past relevant work as a cashier, deli cutter/slicer, receptionist, escort vehicle driver and general ledger bookkeeper. Accordingly, the Court recommends this case be remanded for a more specific inquiry into the demands of Claimant's past relevant work so as to comply with SSR 82-62, 1982 SSR LEXIS 27.

2.      **Correctness of the ALJ's Determination to Afford Little Weight to Dr. Bender's Decision**

Claimant essentially argues that Dr. Bender's opinion as to Claimant's disability should

be controlling.

Commissioner contends the ALJ's decision to afford little weight to Dr. Bender's opinion was appropriate. Specifically, Dr. Bender's opinion was "inconsistent with the objective medical evidence and the opinions of two other physicians." See Def.'s Summ. J. Mot., Pg. 16 (Dkt. 21). Commissioner argues that the "issue of disability is not a medical opinion, but an administrative finding...reserved solely to the Commissioner." 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(2) (2010). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).

Controlling weight may be given only in appropriate circumstances to medical opinions,

i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler, 461 U.S. at 461; 20 C.F.R. § 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

Claimant's argument that the Dr. Bender's opinion regarding Claimant's disability should be controlling is unpersuasive. Dr. Bender's opinion is entitled to consideration but may be disregarded if persuasive contradictory evidence exists. See Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984). The Court finds that the ALJ had "persuasive contradictory evidence" to decline to afford controlling weight to Dr. Bender's opinion. For example, the ALJ noted that "the opinion is not supported by the objective medical evidence, but rather appears to have been parroted from the [C]laimant's subjective complaints because as of September 15, 2008, a note appeared that indicated that the author had not obtained or reviewed any medical evidence of record." (Tr. 73). Additionally, the issue of disability is reserved to the ALJ. See 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Accordingly, Claimant's argument must fail.

# IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Both Motions for Summary Judgment be **<u>DENIED</u>** and the case be remanded to Commissioner.  While the issue of disability is reserved to the Commissioner, the ALJ needed 1) to make more specific findings about Claimant's statements as to which past work requirements could no longer be met and 2) obtain sufficient information on Claimant's past work to permit a decision as to Claimant's ability to return to such past work.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: April 27, 2011

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE