IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


STACY R. PLATTER,

                    Plaintiff,

v.                                    Civil Action No. 1:10CV147
                                          (Judge Keeley)


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION


    On September 16, 2010, the Court referred this Social Security
action to United States Magistrate James E. Seibert with directions
to submit proposed findings of fact and a recommendation for
disposition. On April 27, 2011, Magistrate Judge Seibert filed his
Report and Recommendation, which recommended that the Court deny
the parties' motions for summary judgment and remand this case to
the Commissioner. In accordance with 28 U.S.C. §636(b)(1) and
Fed.R.Civ.P. 6(e), the R&R directed the parties to file any written
objections with the Clerk of Court within fourteen (14) days after
being served with the R&R. On May 3, 2011,the Commissioner filed
objections to the R&R (dkt. no. 28), and the pro se plaintiff,
Stacy R. Platter ("Platter") timely responded to those objections
by a letter dated June 1, 2011 (dkt no. 34). For the reasons that

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

follow, the Court adopts the recommendation of the magistrate judge and **REMANDS** this case to the Commissioner.

## I.  PROCEDURAL BACKGROUND

On May 4, 2007, Platter filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging she was disabled due to Crohn's disease and chronic pain in her shoulder, neck and back, with an onset date of September 15, 2005 (Tr. 75, 79). The Commissioner denied the applications initially on August 24, 2007, and on reconsideration on October 18, 2007. (Tr. 79, 84, 95, 98). Following Platter's request for a hearing, an Administrative Law Judge ("ALJ") conducted a hearing on December 23, 2008, (Tr. 11-59, 104) at which Platter appeared with counsel and testified. An impartial vocational expert ("VE") also appeared and testified.

On March 5, 2009, the ALJ determined that Platter retained the ability to perform her past relevant work and therefore had not been under a disability within the meaning of the Social Security Act from September 15, 2005 through the date of the decision. (Tr. 63). On April 27, 2010, the Appeals Council denied Platter's request for review of the ALJ's decision. (Tr. 6, 140).  On

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

September 16, 2010, Platter filed this action as a <u>pro</u> <u>se</u> claimant,

seeking review of the final decision of the Commissioner.

## II. <u>PLAINTIFF'S BACKGROUND</u>

On September 15, 2005, the date of the onset of her alleged

disability , Platter was thirty-five (35) years old, and on

March 5, 2009, the date of the ALJ's decision, she was thirty-nine

(39) years old. (Tr. 177). Thus, pursuant to 20 C.F.R.

§§ 404.15639(c), 416.963(c), she is considered a "younger

individual" whose age will not "seriously affect [her] ability to

adjust to other work." She has a high school diploma and also

obtained a business college degree in computer technology. (Tr.

207). Her prior work experience includes employment as a bakery

worker, maid, and auto auction driver. (Tr. 200).

## III. <u>ADMINISTRATIVE FINDINGS</u>

Utilizing the five-step sequential evaluation process

prescribed in the Commissioner's regulations at 20 C.F.R.

§§ 404.1520, the ALJ made the following findings:

1. Platter met the insured status requirements of the
   Social Security Act through June 30, 2010;

2. Platter has not engaged in substantial gainful
   activity since September 15, 2005, the alleged
   onset date;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

3.  Platter has the following severe impairments: Crohn's disease with illevesical fistula, as well as the side-effects of recurrent and intermittent urinary tract infections; herniation of the cervical vertebra, with chronic neck, shoulder, and back pain and tobacco abuse;

4.  Platter's impairments, alone or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 416.925 and 416.926);

5.  Platter has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) limited range of light work with the following exertional and non exertional limitations: ability to stand/walk with normal breaks) for no more than six hours out of an eight hour day, sit with normal breaks for no more than six hours out of an eight hour day, no work requiring more than occasional climbing of ladders, ropes, scaffolds, ramps or stairs, no work requiring concentrated exposure to extreme cold or heat or environmental hazards such as dangerous, moving machinery or unprotected heights, and requires two additional breaks of 10 minutes or less during an eight-hour work period for bathroom/hygiene concerns;

6.  Platter is capable of performing past relevant work as a fast food worker, cashier, bookkeeper, deli cutter/slicer, receptionist, sales attendant, and decorator. This work does not require the performance of work-related activities precluded by her residual functional capacity. (20 CFR § 404.1565 and 416.965); and

7.  Platter was not under a "disability," as defined in the Social Security Act, from September 15, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 63-73).

## IV.  **DEFENDANT'S OBJECTIONS**

The Commissioner objects to the magistrate judge's conclusion that the ALJ's analysis regarding Platter's ability to perform her past relevant was inadequate. He asserts that the ALJ followed the criteria in SSR 82-62, and properly relied on the vocational expert's responses to his hypothetical questions. (Def. Objs. p. 1). Platter contends that the record contains inconsistencies and misstatements regarding her medical history and that, by relying on false information in the record, the  ALJ incorrectly concluded that she retained the ability to perform her past relevant work. (Plaintiff's Reply to objs. p. 1)

## V.  **MEDICAL EVIDENCE**

Platter's relevant medical history consists of:

1.    A September 23, 2005 x-ray report from Grafton City Hospital ("GCH") of the left humerus, indicating an impression of normal left humerus with no evidence of dislocation, no abnormal calcifications, and a normal arcomioclavicular joint. (Tr. 275);

2.    A September 23, 2005 x-ray report from GCH of the left elbow, indicating an impression of subtle deformity radial head but no fracture or dislocation. (Tr. 276);

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

3.    A September 27, 2005 report from West Virginia University ("WVU") Department of Medicine, indicating complaints of abdominal pain and a report of a previous diagnosis of Crohn's disease in 2004, taking samples of Asacol until she was unable to purchase it, recently receiving a prescription for Asacol resulting in only one to two bowel movements a day, no blood in the bowel movement, no tenesmus, nausea, vomiting, or mucus, and "a very big improvement from [her] previous symptoms."

A physical examination revealed an alert, oriented and cooperative five feet two inch young female with a weight of 185 pounds, a blood pressure of 130/70, an obese abdomen with no tenderness to palpation, no hepatosplenomegaly, and no CVA tenderness. The assessment indicated "Crohn's disease with ileo-ileal fistula on small bowel follow through from November of last year, now recently started on Asacol with great clinical improvement." The doctor scheduled a colonoscopy and a return appointment after the colonoscopy (Tr. 351-352);

4.    An October 30, 2005 report from GCH from a cervical MRI of the spine, indicating left sided disc protrusion at C6 C7 with potential for impingement on existing neural structures and

normally preserved alignment throughout the cervical spine, and normal vertebral body heights and disk space intervals. (Tr. 274);

5.    An October 30, 2005 x-ray report from GCH, indicating a normal cervical spine series with no evidence of fracture or subluxation. (Tr. 278);

6.    A December 19, 2005 report from the West Virginia University Department of Orthopaedics ("WVUDO") regarding injuries related to an automobile accident and documenting a reported past medical history of Crohn's disease and complaints of neck and right shoulder pain. Platter weighed 185 pounds, had a blood pressure 121/75, no rashes or lesions, no tenderness to palpation along the paraspinal musculature and cervical spine, intact flexion, and a decreased range of motion in extension and right and left rotation secondary to pain. The doctor recommended an injection to aid with the right shoulder tendonitis which Platter refused due to fear of needles. At her request, the doctor referred her for physical therapy and scheduled a follow-up appointment in four weeks; (Tr. 349 - 350);

7.    Medical records from Tygart Valley Rehabilitation & Fitness ("TVR&F") for the period from December 29, 2005 through March 30, 2006, indicating that Platter complained of a loss of

range of motion, ongoing pain in her right shoulder, a feeling of "pins and needles" shooting down her arm for about five minutes, and impaired cervical range of motion. She reported temporary relief following her physical therapy sessions, which each lasted approximately one hour. (Tr. 393 - 401);

8. A December 29, 2005 record from GCH, indicating a diagnosis of right shoulder pain, rotator cuff and cervical strain. (Tr. 270-272);

9. A December 4, 2006 ultrasound report from GCH, indicating an impression of no identified abnormality of the uterus or ovaries, abnormal appearance within the bladder and a recommendation for a follow-up CT or cystoscopy. (Tr. 277, 463);

10. A December 18, 2006 Pelvic CT with contrast report from GCH, indicating an impression of an infected ureteral remnant extending from the peri-umbilical region down to the superior aspect of the bladder that contained air and fluid and suspected bilateral adnexal cysts with no significant free fluid but no definite focal mass to suggest carcinoma. (Tr. 273, 461);

11. A January 5, 2007 report from a physician's assistant, Mary Helen Hess, University Hospital Associates ("UHA"), indicating a history of two or three urinary tract infections in September

2007 that did not respond to antibiotics, an ultrasound that was unremarkable, a CT scan that revealed the urachal remnant and a sixteen year history of smoking a pack of cigarettes a day. Her current symptoms included GI, lower abdominal pain with all other systems negative. Her reported current medications included Asacol, two tablets three times a day, and Lorcet for pain. The physical examination revealed Platter to be alert and orientated, in no acute distress, with lower abdominal tenderness, and no CVA tenderness.   The physician scheduled a cystoscopy with possible biopsy and retrogrades for January 17, 2007[1]. (Tr. 347);

12.   A March 19, 2007 physician record from David M. Kinney, M.D., Monongalia General Hospital ("Mon General"), indicating that Platter complained of a moderate amount of pain in her right leg. Platter reported her pre-examination treatment as taking non-steroidal anti-inflammatory drugs and 16 Advil a day. The physical examination revealed mild distress, normal range of motion of the legs, a hgb of 6.9, a history of Crohn's disease, and a history of smoking. The diagnosis was anemia, Crohn's disease, and ongoing tobacco abuse. (Tr. 301 – 302);

---

[1]     The record does not contain a report documenting whether a cystoscopy occurred on January 17, 2007.

13.  A March 19, 2007 office note from Carla Scarf, PA-C, indicating that Platter complained of achiness, pain and being tired all the time. The physical examination revealed swelling and a knot on her right lower leg which had been there for two days. Platter admitted that she had been taking 16-20 Advil a day for the last several weeks, if not months, to manage the pain from an old worker's compensation injury involving her right shoulder and admitted that "she knows that she has probably overdone it." Following a consult with Dr. Wentzel, Scarf advised Platter to go to Morgantown to the emergency room to have an ultrasound to determine if she had a blood clot, and further advised her that the bleeding was probably from gastritis secondary to NSAID abuse. (Tr. 491);

14.  A March 20, 2007 discharge summary from Mon General, indicating a discharge diagnoses of anemia due to gastrointestinal blood loss and Crohn's disease, and noting:

> The patient is a 37-year-old female who came to the diagnosis of Crohn's disease by Dr. Medina in Clarksburg, West Virginia in 2004. She came in with right lower leg swelling. At that time she was seen in Grafton Emergency Department. At that time she was found to have a low hemoglobin. She presented to the emergency department with the same right leg swelling. A venous Doppler of the lower

extremities was negative. A CT of the pelvis showed wall thickening over a 20-50 cm length at mid ileum, increased fluid, air, and soft tissue element over a 3-4 cm area abutting the right rectum. There was also a rectus abdomens fistulous communication involving the anterior-superior urinary bladder and mid ileum. There was also a possible cyst and a fluid accumulation.

Because of the above findings, Surgery was consulted and Dr. Jo Ann O'Keefe was also consulted, and the recommendation was that she should go to UPMC. She did receive a transfusion. She was also found to have a urinary tract infection and was started on Cipro. However, on March 21, 2007, the patient wanted to go against medical advice, and despite telling them that this was potentially life-threatening to them, they understood the consequences. She and her husband left.

(Tr. 283-284);

15. Medical records from Mon General dated March 20, 2007, indicating a history of Crohn's disease since 2004, use of Asacol, 800 mg three times daily since that time, history of tobacco use, "stool-like vaginal discharge occurring 50% of the time with bowel movements and frequency, urgency, nocturia 2-3x a night occurring in the past 6-7 months," no expellation of air during urination, and use of Advil 1600 mg, three to four times a day, for chronic right shoulder and back pain related to an injury from a September 2006 motor vehicle accident. The impression was 1) Crohn's disease

with colovaginal and probable colourinary fistula; 2) microcytic hypochromic anemia; and 3) chronic back and right shoulder pain with non-steriodal anti-inflammatory drug use. The physical examination revealed an alert, well-nourished female in no acute distress, a blood pressure of 96/57, normal gait and station with full range of motion of all extremities, a pitting edema on the right lower extremity, a soft, flat, non-distended abdomen with slight tenderness to deep palpation in the umbilicus and bilateral lower quadrants, and no hernia. The recommendation was for a possible course of steroids, possible surgical repair of the fistula, and a consultation with a gastroenterologist. (Tr. 294 – 296);

16. A March 27, 2007 office note from UHA indicating a history of an initial visit to this clinic in September 2005, at which time, after reviewing her records, the physicians had agreed with "likely diagnosis of Crohn's disease." The doctors then discussed with Platter the need for more aggressive therapy in addition to Asacol and recommended treatment with 6-MP or Imuran, and explained that a tissue diagnosis would be needed prior to initiation of this type of therapy. They scheduled a colonoscopy that according to the record Platter did not have. (Tr. 345);

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

During this office visit on March 27, 2007, Platter reported a history of having been seen the week before by her primary care doctor for treatment for some lower extremity swelling. At that time, the doctor had obtained a CBC that revealed a low hemoglobin of 7. She had been referred to Mon General for treatment, where she was admitted and given three units of packed red blood cells.

UHA's records document that Platter reported some abdominal pain and three to four watery to semi-solid bowel movements a day, and that following a CT scan, she was started on Cipro, which "greatly helped with her abdominal pain." Following discharge, she had returned to UHA for further management. when she presented at UHA, Platter was on Asacol two tablets three times a day, in addition to Cipro 500 mg b.i.d.

The physical examination at UHA revealed a blood pressure of 100/60, a weight of 147.9, no acute distress, soft nontender, nondistinded abdomen with normal bowel sounds, and no clubbing, cyanosis or edema. The assessment was to obtain a colonscopy for tissue diagnosis, confirmation of Crohn's disease and plan for initiation of more specific therapy that might include either Imuran or 6-MP in addition to the Asacol, as well as Remicade infusions. (Tr. 345);

17.  An April 4, 2007 office note from Dr. Wentzel, indicating that Platter had requested pain medication for right leg pain and knots in her leg. A physical examination revealed no acute distress, a mildly painful, palpable, irregularly shaped, firm lesion on her right posterior knee, a smaller lesion on the medial portion of her right pretibial area, but no swelling or erythema. Dr. Wentzel prescribed Ultram 50 mg three times a day and advised Platter not to use any NSAIDs "as this may worsen her Crohn's disease in light of her recent GI bleed." He planned to obtain and review her records from Mon General, including the whole body CT mentioned by Platter, and to proceed from there. (Tr. 492);

18.  An April 18, 2007 medical record from Ruby Memorial Hospital ("RMH"), indicating that Platter had had a colonoscopy and biopsy. Examination revealed an anterior fissure and a single aphthoid-type ulcer in the sigmoid colon. Platter was advised to follow up with Dr. Goebel for the pathology results and further care. (Tr. 341);

19.  An April 25, 2007, record from Taylor County Medical Center("TCMC"), indicating that Platter complained that the Ultram was not working and that, throughout the day, she had aches and pains all over, but mostly over her right shoulder and neck.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Platter reported "she feels limited by her Crohn's disease" and "feels she has no energy and part of this is due to her poor sleep." Platter's doctor encouraged her to "get out and do some activity every day, to walk, play frisbee, anything really that will get her more active," and "to make sure that the house has plenty of sunlight, to do things during the day to try and help her develop some better physical conditioning, which I think her inactivity is causing her to have stiffness and pain and also to help develop some better sleep hygiene habits so that she is more tired at evening-time." (Tr. 493);

20. A May 5, 2007 office note from Dr. Ostrinsky indicating the results of Platter's colonoscopy, including a suspected ileovesical fistula. Dr. Ostrinsky instructed her to continue the Asacol, two tablets three times a day, and discussed biological therapy. (Tr. 343);

21. A June 11, 2007 note from TCMC, indicating that Platter was concerned about a possible urinary tract infection and was "very up front about saying that she does not want to be on any controlled medicines or medicines that may addict her" due to her sister going through a similar problem. The diagnosis was a urinary

tract infection that was "likely chronic and definitely a possibility if [she] does, in fact, have a fistula." (Tr. 495);

22. An August 16, 2007 report from Dr. Thimmapppa following a disability determination examination, indicating that Platter complained of chronic pain in her neck and right shoulder and Crohn's disease. Platter reported that she has smoked "one pack of cigarettes daily for 12 years and gets frequent urinary tract infections." The physical examination revealed that Platter was alert and well oriented, appeared to have good memory and judgment, and had normal ability to walk and squat, pick up a coin, speak and communicate, walk on heels and toes, and write. (Tr. 354-356);

23. An August 21, 2007 physical residual functional capacity assessment from Dr. Cindy Osborne, indicating that Platter can occasionally lift and/or carry (including upward pulling) a maximum of 20 pounds, can frequently lift and/or carry (including upward pulling) a maximum of 10 pounds, can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, can sit (with normal breaks) for a total of about 6 hours in an 8 hour workday, has unlimited ability to push and/or pull (including operation of hand and/or foot controls), other than as shown for lift and/or carry, can frequently balance, can occasionally climb

ramp/stairs, stoop, kneel, crouch and crawl, can never climb ladders, ropes or scaffolds, had no manipulative, visual or communicative limitations, can have unlimited exposure to noise and vibrations, and should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Osborne indicated that Platter's "complaints are mostly credible but do not meet or equal any listing" and decreased Platter's RFC to light with limitations as previously indicated. (Tr. 360-367);

24.   A September 18, 2007 report from UHA, indicating that the April 2007 colonoscopy revealed "some Crohn's colitis at the terminal ileum" and considerable irregularity and areas of narrowing of the distal ileum consistent with the patient's history of Crohn's disease. Platter reported significant improvement in her disease process and symptoms, but still having constant diarrhea although it is now "more solid in consistency," much improved nocturnal diarrhea, occasional stool in her urine but "it is probably 50% better than before," "still has abdominal pain and tenderness on the lower quadrants of her abdomen but it is better than what it used to be prior to starting her current therapeutic

regimen," and continues to have "back pain that she attributes to a motor vehicle accident." (Tr. 370). The report further stated:

> Although her symptoms have improved, she is still anxious about her fistula. She has not seen a urologist. She was told to see a urologist in the past and was actually scheduled for a urological visit. The idea of Remicade or Humira therapy was initially discussed with the patient considering her history of enterovesiular fistula. She is extremely averse of needles.

The doctor assessed Platter's status as follows:

> This 37-year-old Caucasian woman with a history of enterovesicular fistulizing Crohn's disease now clinically better with her current therapeutic regimen of Imuran 100 mg by mouth daily and Asacol, 3,200 mg by mouth daily now. Obviously, clinically stable with moderate improvement albeit not fully. She does still have her enterovesicular fistula that needs to be looked at. Biological therapy as far as Humira and Remicade have been shown to mitigate enterovesicular fistulas. At this point, she is very averse of needles and this will be a problem in the future if we decide to start her on any biologicals. The fact that the [Claimant] responded well to her current therapeutic regimen suggests a better prognosis.

(Tr. 370-371);

25. An October 2, 2007 report from UHA, indicating a further evaluation for gross hematuria, bladder infections and air through her urethra. The assessment was an enterovesical fistula. The

18

doctor recommended a cystoscopy with possible biopsy and cisternogram to evaluate the question of the fistula. (Tr. 368);

26. An October 11, 2007 report from TCMC, indicating that Platter complained she was miserable and frustrated due to the continuing urologic problems and Crohn's disease. She reported an episode of passing a lot of blood and clots two weeks ago but did not seek medical care at that time. She also reported that she still had a lot of pain, primarily in her right shoulder, radiating up to her neck and causing headaches and that, even though she has taken the Tramadol, "it really does not seem to work and she is scared to take anything else for fear of exacerbating her Crohn's." The physical examination revealed a weight of 140, blood pressure 95/61, no acute distress, some tension over her shoulders and neck at the paraspinous muscle, some limited range of motion in the right shoulder, some pain on palpation over the lateral border of the right scapula, and a soft, nontender, nondistended abdomen. Platter requested and received Lortab with instructions to use it sparingly. (Tr. 497);

27. An October 18, 2007 physical residual functional capacity assessment from Dr. Thomas Lauderman, indicating a primary diagnosis of Crohn's disease with a secondary diagnosis of neck and

shoulder arthralgias. Platter can occasionally lift and/or carry (including upward pulling) a maximum of 20 pounds, can frequently lift and/or carry (including upward pulling) a maximum of 10 pounds, can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, can push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry, can occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch and crawl, has no manipulative, visual or communicative limitations, can have unlimited exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and should avoid concentrated exposure to extreme cold and heat and hazards. Significantly, Dr. Lauderman stated that "Claimant is partially credible since the medical evidence does not substantiate the Claimant's allegations to the degree alleged." (Tr. 373-376);

28. A November 27, 2007 report from Stephan Goebel, M.D., Assistant Professor, Section of Digestive Diseases, WVU Department of Medicine, regarding a follow-up examination for a referral from Peter Wentzel, M.D., reporting the results from treatment with Imuran and Asacol. Platter stated that she continues to have

episodic diarrhea, abdominal pain and UTIs. The assessment was Crohn's disease with enterovesicular fistula. Dr. Goebel recommended continuing the treatment with Asacol and Imuran until her scheduled consultation with Dr. Cassim. He further recommended serious consideration of biologic therapy which Platter "continues to be reluctant to institute." (Tr. 478);

29. A December 6, 2007 report from Rias Cassim, M.S., Associate Professor, WVU Department of Surgery, regarding a consultation for her Crohn's disease with enterovesical fistula, indicating that Platter reported a diagnosis of Crohn's disease approximately 4-5 years ago at United Hospital Center by Dr. Medina, for which he began treatment with Asacol. At that time she complained of severe abdominal cramping, nausea and vomiting. She had "what she describes as a small bowel follow through, which revealed inflammatory changes in the terminal ileum." She did not follow up with any physicians for three to four years until she began treatment with Dr. Stefan Goebel at WVU.

When she began treatment with Dr. Goebel, she reported continuous "sharp, like being cut with a knife, pain" in her lower abdomen and rated the pain as 8 on a scale of 1-10, no nausea, vomiting, fever or chills, no bleeding from the rectum, melemna or

fecal incontinence, two bowel movements a day that she describes as her norm, no weight loss, no visual signs of joint pain or skin lesions. She further reported that Dr. Goebel started treatment with Imuran and continued 2400 mg of Asacol.

Physical examination revealed a weight of 149 pounds, blood pressure of 124/70, no lymphadenopathy or pallor, soft, nondistended lower abdomen, some tenderness to palpation in the lower abdomen below the umbillcus in both lower quadrants, no palpated masses, no appreciated organomegaly, and no muscular deformities. The assessment confirmed terminal ileal Crohn's disease with an enterovesical fistula. The doctor scheduled a laperoscopic-assisted terminal illeal resection with takedown of the fistula for January. (Tr 276-277);

30. A January 7, 2008 Abdomen/Pelvis CT from WVUH, indicating an impression of thickening of the multiple loops of small bowel, which is thought to represent illeum, gas within the bladder, which may be related to previously described enterovesicular fistula, abnormal collection along the anterior abdominal wall with an area of soft tissue density traversing the subcutaneous fat anteriorly that may relate to an enterocutaneous fistula, bilateral ovarian cysts, thickened endometrial canal and thickened wall of the

gastric pylorus. The physician recommended an ultrasound in 2-3 months to confirm resolution of the cysts, and noted that involvement of the transverse colon could not be excluded. (Tr. 446-447);

31. A January 7, 2008 WVU Hospital Department of Emergency Medicine pre-operation checkup report, indicating a diagnosis of severe anemia, Crohn's disease, enterovesticular fistula, abdominal pain, diarrhea, a headache and lumbar pain. Medications included Asacol, Imduran, Hydrocodone, Tramdol and Bactrim. (Tr. 403 - 404);

32. A January 8, 2008 WVU Hospital pre-admission for surgery report. indicating a hemoglobin of 6.7 that required a referral for a blood transfusion. It further noted blood in her urine, the presence of a fistula and chronic pain. (Tr. 407). The diagnosis was Crohn's disease, anemia, and a chronic UTI and other than these symptoms, she was asymptomatic. (Tr. 410);

33. A January 8, 2008 WVU Hospital Department of Medicine pre-op report, indicating a diagnosis of anemia with a hemoglobin of 6.4 and hematocrit of 21.2 Platter received transfusions of two units of packed red blood cells. When rechecked, her hemoglobin was 8.3, with a hematocrit of 26, her approximate baseline.  She was

discharged with instructions to have a CBC soon and an ultrasound of her bilateral ovarian cysts in about three months. (Tr. 427);

34. A January 15, 2008 discharge summary from WVUH, indicating the placement of ureteral stents, an exploratory laparotomy, a takedown of illeovesical fistula, excision of a large inflammatory mass, including right hemicolectomy and small bowel resection of approximately 2.5 feet of the terminal illeum, partial cystectomy and primary stapled ileotransverse anaetomosis. She was discharged with prescriptions of Percocet and Colace, instructions to continue her home medications, and to follow up with Dr. Cassim on January 31, 2008. She was also instructed to have a cystogram the morning of January 31, 2008, and then to follow up with urology on January 31, 2008. (Tr. 418, 423);

35. A January 18, 2008 physical therapy evaluation conducted while in the hospital following her January 15, 2008 surgery, rating Platter's strength in her left and right shoulder, elbow, wrist/hand, hip, knee and foot/ankle at a strength level of at least 3 out of 5. It further indicated that, at the time of the assessment, she "refused to get out of bed" and stated she "wanted to walk later" and that she had been ambulating around the room.

The plan was for mobility training once a day for three to five days. (Tr. 414);

36. A January 31, 2008 cystogram report from WVUH indicating the bladder is smooth in contour with no extravasation and no fistulous connection seen. The impression noted an unremarkable cystogram, and further noted that Platter could only tolerate 60 ml of total volume. (Tr. 444);

37. A January 31, 2008 post-operative progress note from Dr. Cassim, UHA, indicating that Platter was doing "fairly well" and that her wounds were healing well. At discharge, Platter was given two prescriptions for stool samples, instructions to take Imodium twice a day, continue Asacol, discontinue self-medication with Imuran, and follow up in three weeks. (Tr. 475);

38. A February 25, 2008, report from Dr. Goebel at UHA, indicating Platter was having diarrhea "with a lot of urgency and some loss of control" up to 30 times a day, no bleeding, incontinence of both bowels and her bladder, very swollen, tight and painful lower extremities from retention of large amounts of fluid. The physical examination revealed a weight of 154.2 pounds, blood pressure of 122/70, no acute distress, no rashes, ulcers or jaudice, midline abdominal incision that is "healing quite well"

but has a "small amount of serious drainage," and +3-4 pedal edemas noted bilaterally in lower extremities extending midway up her legs. The doctor prescribed Questran powder to help with the diarrhea, lasix 30 mg daily to help with fluid retention, continuation of Asacol and a follow-up appointment in one week. (Tr. 472 – 473);

39. A February 27, 2008 report from Peter Wentzel, M.D., TCMD, regarding a two month follow up appointment following a recent partial colectomy and partial bladder resection for a enterovesical fistula. Platter presented complaining of continuing frequent diarrhea multiple times a day and urinary frequency but no dysuria anymore. Her medications included Lortab, which she "feels this is doing an adequate if not ideal job of controlling her neck and back pain and abdominal pain," Klonopin for anxiety and depression, secondary to her Crohn's disease, Asacol for Crohn's disease, and Lasix. The physical examination revealed a weight of 146.6 pounds, blood pressure of 119/77, no distress, better color than in past, warm and well perfused extremities with +1 to +2 edema in lower extremities, appropriate mood and affect, good memory, cognition and insight, and in line and straight back with some mild spasm. The doctor recommended continuation of care with

Drs. Cassim and Goebel, refill of Loratab and a follow-up appointment in a month or sooner if any problems arise. (Tr. 500);

40. A March 31, 2008 report from Peter Wentzel, M.D., TCMD, indicating Platter complained of feeling miserable and continuing to have flatus and some fecal matter from the vagina. The physical examination revealed weight of 160.4, blood pressure 95/56, no acute distress, appearance of some fatigue, soft, nontender, non-distended abdomen, warm and well perfused extremities, appropriate mood and affect, normal memory, cognition and insight, no suicidal or homicidal ideations, fair sleep, and increased appetite that she believes is due to frustration regarding possible additional surgery and inability to have sex. Dr. Wentzel recommended a referral to Dr. Goebel for work up regarding possible recurrent enterovesicular fistula, and continuation of medications, including Loratab for pain and Klonopin for anxiety and depression, that he believes is more situational than chronic. He further stated he would not continue the Klonopin long term. (Tr. 501);

41. An April 7, 2008 Abdomen Pelvis WIV Contrast CT report, indicting an impression of "essentially near complete resolution of the small bowel wall thickening when compared to the previous examination," no air or contrast seen within the vagina or the

bladder to definitely suggest fistula formation to either of these structures, but recommended clinical correlation, also reporting distention of the gallbladder lumen but no evidence for wall thickening or duct dilatation, stable appearance of a benign-appearing spenic cyst, and resolution of the bilateral ovarian cysts with one residual small irregularly contoured cystic mass in the right ovary, likely representing an involuting physiologic cyst. (Tr. 443);

42.  A May 20, 2008 report from Dr. Wentzel, TCMC, indicating Platter complained of feeling bad, having headaches, neck pain, tension, anxiety, fear of people getting into car wrecks, feeling something bad is going to happen and worrying about things constantly.  The physical examination revealed Platter's weight continuing to increase, 178 pounds, blood pressure 114/79, no acute distress, spasm and tension over neck and paraspinous muscles, poor slouching posture, soft, nontender and nondistended abdomen, positive bowel sounds, and warm and well perfused extremities.  The doctor recommended consultation with Dr. Goebel regarding continuation of treatment with Asacol and Imuran. Platter stated that she had not been able to get an appointment with either Dr. Goebel or Dr. Cassim, and that she had lost her Charity Care at

WVU. Dr. Wentzel continued the Klonopin, started treatment with Celexa and, due to concern about becoming dependent on Hydrocodone, reduced the number of pills from 120 to 90, with a plan to continue reducing the number with each subsequent refill. (Tr. 502);

43. A June 30, 2008 report from Dr. Wentzel, TCMC, indicating that Platter continued to have anxiety, depression and pain. She had stopped taking the Celexa because it gave her nosebleeds and nightmares, but continued with the hydrocodone and Klonopin, even though she does not feel they help her very much. Due to loss of her Charity Care at WVU and her Medicaid having been turned down, she has not been able to follow up with either Dr. Goebel or Dr. Cassim. The physical examination revealed weight of 187 pounds, Blood pressure 98/61 no acute distress, warm and well perfused extremities, soft, nontender and nondistended abdomen, flat affect, and good memory, cognition and insight. Dr. Wentzel noted that Platter appeared to be depressed and "somewhat frustrated and defeated by the amount of money she owes and by the inability to get consistent health care with specialists." He recommended continuation of Klonopin, started treatment with Cymbalta, Tylenol for her headaches and neck tension, and hydrocodone only when her

headaches and pain are very bad, with a follow-up appointment in one month. (Tr. 503);

44. A July 30, 2008 report from Dr. Wentzel, TCMC, indicating that Platter complained of headaches, neck tension, anxiety and depression. She reported she had stopped taking the Cymbalta because it made her "jittery and anxious," but still takes the Klonopin, although not very often, and is still taking the Hydrocodone three times a day. The physical examination revealed a weight of 191.6, blood pressure of 96/65, no acute distress, mild cervical chain lymphadenopathy, more on left than the right, warm and perfused extremities, appropriate mood and affect, and good memory, cognition and insight. Dr. Wentzel recommended continuation of Klonopin, Hydrocodone tapered to twice a day as needed, and a follow-up appointment in three months. (Tr. 504);

45. An August 8, 2008 report from UHA, indicating that Platter complained of continuation of brownish discharge and air through the vagina, usually after a bowel movement; assessment included a possible fistula between the bowel and bladder, or between the vagina and colon. The recommendation was to schedule a D&C and an EUA under anesthesia. (Tr. 468-469);

46.  An August 26, 2008 report from Stanley Zaslau, M.D., Associate Professor, WVU Department of Urology, indicating Platter denied any urinary symptoms or urinary tract infections. The physical examination revealed she was alert and oriented, was in no acute distress, had a nontender, nondistended abdomen, and a supple neck. The doctor recommended that "since she is doing so well in terms of voiding, we will just see her on a yearly basis." (Tr. 467);

47.  A September 25, 2008 cervical spine noncontrast MRI report from GCH, indicating a normal contour of spinal cord and normal alignment of the cervical spine with preserved vertebral body height, contour and signal intensity with an impression of a small left paracentral disc herniation at C6-7 with mild left neural foraminal encroachment, but no spinal stenosis. (Tr. 455);

48.  A September 30, 2008 report from Eddie HM Sze, M.D., UHA, concerning a referral to determine whether Platter had a fistula between bowel and bladder. (Tr. 465, 469). Platter complained that her "condition is severely interfering with her daily activities and her quality of life and wants to have a definitive diagnosis and possible surgical repair." The physical examination revealed a weight of 195, blood pressure of 112/76, no acute distress, no

abnormal vaginal discharge or lesion, and a small amount of blood present at cervical os. Dr. Sze scheduled a D&C, EUA. (Tr. 466);

49.  A March 9, 2009 office note from TVTCC, indicating that Platter complained of sinus pain, sore throat and mid-low lumbar tenderness.  The physical examination revealed that Platter now weighed 226-1/2 pounds and had a blood pressure of 116/70.  The doctor recommended continuation of Ultram and Lortab. (Tr. 522);

50.  An April 13, 2009 office note from TVTCC, indicating Platter continued to complain of neck pain and Crohn's disease. The physical examination revealed a weight of 226, blood pressure 108/72, and tenderness over trapecius. The doctor recommended a referral to United Hospital Center Pain Clinic for an injection, discussion of a diet to address obesity, and treatment for tobacco abuse. (Tr. 523);

51.  A May 27, 2009 office note from TVTCC indicating Platter had returned for a follow-up appointment.  The physical examination revealed she weighed 223 pounds and had a blood pressure of 126/82. The doctor refilled her prescriptions for Klonopin and Lortab, and directed her to continue the nicotine patch even though she stills wants to smoke. (Tr. 521);

52. An August 6, 2009 office note from TVTCC, reporting that Platter had begun smoking again. A physical examination revealed a weight of 231 pounds and a blood pressure of 124/78. The doctor refilled her Klonopin and Lortab prescriptions, and discussed treatment for smoking with nicotine gum. (Tr. 520);

53. An October 28, 2009 office note from TVTCC, indicating Platter complained of continuing symptoms of Crohn's disease, diarrhea, and neck and shoulder pain with weather changes. The physical examination revealed she weighed 233.5 pounds and had a blood pressure of 120/80. The doctor continued the Lortab and Klonopin meds, and again discussed her nicotine abuse. (Tr. 519);

54. A November 11, 2009 office note from TVTCC, indicating that Platter complained of abdominal pain, Crohn's disease, diarrhea, and neck pain. On physical examination she weighed 231 pounds and had a blood pressure of 120/60. The diagnosis was Crohn's disease, C6-7 HVP and rectovaginal fistula. (Tr. 518); and

55. A January 13, 2010 office note from TVTCC, indicating a diagnosis of Crohn's disease, possible osteopenia and C 6-7 HNP. The doctor continued Platter's prescriptions for Lortab and Klonopin. Significantly, he also noted:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

>She remains disabled and considering the chronicity
>of this problem/complications, a return to work is highly
>unlikely to occur in her lifetime.

(Tr. 517).

## VI.  DISCUSSION

### A.

The magistrate judge recommended remanding this case in order

to permit

>the ALJ to make specific findings about
>Plaintiff's statements as to which
>requirements of her past relevant work she was
>no longer able to meet and to obtain
>sufficient information about Plaintiff's past
>work to permit a decision as to her ability to
>return to such work.

(R&R at 28). In his objections, the Commissioner argues that the

ALJ's detailed hypothetical questions to the VE, the answers

provided by the VE, and the evidence of record all substantially

support the ALJ's determination of no disability and comply with

Social Security Ruling 82-62. (Def. Ojbs. at 2)

Platter, on the other hand, contends that the ALJ based her

opinion on "inconsistancies [sic] and errors" in the evidence of

record, necessitating a new hearing "where I can voice the facts

and be heard." (Plaintiff's reply at 1). She argues that the record

is replete with error and false information and that no one has

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

responded to her numerous letters to the Social Security Administration. (Plaintiff's reply at 1).

B.

Following a review of all the evidence of record, the magistrate judge concluded that remand was necessary so that the ALJ could inquire "more specifically into the physical and mental demands of Claimant's [Platter's] past relevant work as a cashier, deli cutter/slicer, receptionist, escort vehicle driver and general ledger bookkeeper." (R&R at 25).

The fourth step of the sequential evaluation process requires an ALJ to determine a claimant's residual functional capacity ("RFC"). In making this determination, the ALJ is to follow the provisions of 20 C.F.R. §§ 404.1520(e) and (f) and §§ 416.920(e) and (f), that require an ALJ to carefully consider the interaction of the limiting effects of the person's impairment and the physical and mental demands of that work.

20 C.F.R. §§ 404.1520 (e) and (f), and §§ 416.920(e) and (f), in pertinent part, provide:

> (e) Your impairment(s) must prevent you from doing past relevant work. If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your

residual functional capacity and the physical
and mental demands of the work you have done
in the past.  If you can still do this kind of
work , we will find that you are not disabled.

(f) Your impairment(s) must prevent you from
doing any other work.  (1) If you cannot do
any work you have done in the past because you
have a severe impairment(s), we will consider
your residual functional capacity and your
age, education, and past work experience to
see if you can do other work.  If you cannot
we will find you disabled.

Social Security Ruling ("SSR") 82-61 outlines three possible

tests an ALJ may use when determining whether an individual

"retains the [RFC] to perform the physical and mental demands of

the kind of work he or she has done in the past." Those tests

include:

1)  Whether the claimant retains the capacity
to perform a past relevant job based on a
broad generic, occupational classification of
that job, e.g., 'delivery job,' 'packaging
job,' etc. Finding that a claimant has the
capacity to do past relevant work on the basis
of a generic occupational classification of
the work is likely to be fallacious and
unsupportable.  While 'delivery jobs,' or
'packaging jobs,' etc.,  may have a common
characteristic, they often involve quite
different functional demands and duties
requiring varying abilities and job knowledge;

2)  Whether the claimant retains the capacity
to perform the particular functional demands

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

and job duties peculiar to an individual job as he or she actually performed it. Under this test, where the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled'; or

3) Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy. (The Dictionary of Occupational Titles (DOT) descriptions can be relied upon – for jobs that are listed in the DOT – to define the job as it is *usually* performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.

A former job performed by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled'.

SSR 82-61, 1982 WL 31387, at *1 – *2 (1982).

SSR 82-62 establishes the relevant criteria for determining a claimant's ability to do past relevant work:

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> To be found disabled, an individual . . . must have a medically determinable physical or mental impairment(s) of such severity that he or she is not only unable to do his or her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

SSR 82-62, 1982 WL 31386, at *1 (1982).

Pursuant to SSR 82-62, an ALJ should carefully appraise

> (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles,* etc., on the requirements of the work as generally performed in the economy.

Id. at *3. A decision that an individual has the capacity to perform a past relevant job must contain the following:

> 1.  A finding of fact as to the individual's RFC;
>
> 2.  A finding of fact as to the physical and mental demands of the past job/occupation; and
>
> 3.  A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

Id. at *4.

SSR 82-62 also provides that documentation of past relevant work should include

> . . . factual information about work demands which have a bearing on the medically established limitations. Detailed information about the strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived form [sic] a detailed description of the work obtained from the claimant, employer, and other informed source. Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.

Id. at *3. According to SSR 82-62, "the claimant is the primary source for vocational documentation and statements by the claimant regarding past work are generally sufficient for determining skill level; exertional demands and nonexertional demands of [the past relevant] work." Id.

At the hearing before the ALJ, Platter testified that her impairments affected her ability to perform tasks such as cooking, driving and standing. She stated she was unable sleep because it

is "hard to get comfortable," "difficult to stay asleep," and that she wakes a lot "to use the bathroom," (Tr. 218), is unable to prepare meals because she has difficulty lifting items and gets "dizzy and lightheaded if she stands too long" (Tr. 219). In addition, she claimed she was unable to do household chores because she could not "move around to do them and also gets very dizzy and lightheaded easily," is unable to go places outside the home because "I can't walk very far, I get dizzy easily and go to the bathroom constantly." (Tr. 222).

Platter further testified that her illness affected the following abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing and using her hands. She asserts that "moving around physically hurts after a few minutes, sitting makes [her] back and legs hurt," and that she "can lift very little (under 5 lbs) without dropping" items. (Tr. 222). She estimates that she can walk 50 to 100 feet before needing to stop and rest for 10-15 minutes, cannot handle stress or changes in routine very well and has noticed that following the  auto accident she is "very, very nervous riding in or driving a car." (Tr. 222-223).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

At the hearing, the ALJ posed a series of hypotheticals about Platter's RFC to the VE. First, she asked the VE to:

> [a]ssume that [Claimant] has the residual functional capacity to perform the exertional work of light, as defined by statute, occasionally lift and/or carry 20 pounds frequently, lift and/or carry 10 pounds, stand and/or walk with normal breaks, for a total of about six hours in an eight [hour] work day, sit with normal breaks for a total of about six hours in an eight [hour] work day. For posturals, I want you to assume that [Claimant] could occasionally climb ladders, ropes and scaffolds, occasionally climb ramps and/or stairs, occasionally balance, stoop, kneel, crouch, and/or crawl. For environmental, I want you to assume that [Claimant] must avoid concentrated exposure to extreme cold and/or heat, avoid concentrated exposure to hazards, such as dangerous machinery and/or heights, etc.

(Tr. 54).

The VE replied that Platter would be "able to do the work of a fast food worker, the work of a cashier at the bakery, the general ledger bookkeeping job, the deli cutter/slicer job, the cashier jobs, the receptionist work, sales attendant, and decorator." (Tr. 54-55).

The ALJ then added the following limitations:

> I want you to assume...that [Claimant] would need two additional breaks during an eight hour work day for bathroom and hygiene needs.

41

> With a break period of no more than ten
> minutes each, and possibly less.

(Tr. 55).

When asked whether Platter would be able to perform her past work

with these additional limitations on her RFC, the VE answered that

she would be able to do to. (Tr. 55).

The ALJ then posed a third hypothetical:

> I want you to assume that all the testimony
> you've heard today from [Claimant] would be
> deemed credible about her pain complaints and
> functional limitations. That [Claimant] has
> constant pain in her neck, with limited range
> of motion, especially from left to right. She
> has an average of three headaches a week that
> last at least an hour each at a time, if not
> more. She experiences shooting pain down her
> right shoulder to her fingers, with numbness
> and tingling. She's right-hand dominant, and
> as a result of this pain and tingling, it's
> difficult for her to use her right hand. She
> has daily abdominal pain and cramping. She
> needs to make constant trips to the bathroom,
> at least once an hour. She can only sit for
> one hour at a time. She can only stand for
> only 30 minutes at a time. She can only walk
> 30-40 minutes at a time. And she can only lift
> a five pound bag of sugar at most. If you
> assume that all of these pain complaints and
> limitations are also supported by the
> objective medical evidence, would there be any
> occupations that [Claimant] could perform?

(Tr. 55-56).

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

The VE responded that, if all of Platter's allegations regarding her limitations were included, they would eliminate all occupations. (Tr. 56).  The ALJ then made further inquiry, posing a fourth hypothetical to the VE:

> I want you to assume the exertional level has changed to sedentary. And then I'd like you to assume the same RFC limitations as RFC number two, so that the posturals, environmental limitations identified in RFC number two, which include the two additional ten minute or less breaks during the eight hour work day are added to RFC number four. If you do that, would the past work that you've identified still exist in any way?

(Tr. 56).

The VE responded that, even with these limitations, Platter would retain the ability to perform the work of a receptionist and as a general ledger bookkeeper. (Tr. 56).

Platter's attorney then asked whether, if the two breaks presented in hypothetical numbers two and four were unscheduled and occurred with little announcement, this would affect her ability to perform the listed occupations. (Tr. 57).  The VE testified that the additional unpredictable breaks would "be more problematic" in some positions, such as the cashier and fast food positions. (Tr. 57).

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

SSR 82-62 requires that "every effort must be made to secure evidence" that clearly and explicitly resolves whether a claimant retains the functional capacity to perform past work. SSR 82-62 at *3.

It further provides that, after carefully considering the medical evidence of record, the claimant's statements, as well as statements from others regarding the demands of the past relevant work, and the pertinent nonmedical facts, the ALJ must then explain in detail the specific evidentiary basis for the disability determination. Id. at *4. This explanation must outline the weight the ALJ attributed to the pertinent medical and nonmedical factors in the case, and also reconcile any significant inconsistencies. Id.

In this case, the ALJ determined that Platter was capable of performing her past relevant work as a fast food worker, cashier, bookkeeper, deli cutter/slicer, receptionist, sales attendant, and decorator.  He explains that "This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity" (20 CFR 404.1565 and 416.965). (Tr. 73)

In explaining the basis for this finding, the ALJ stated:

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> The Administrative Law Judge called upon the vocational expert to characterize the claimant's past relevant work. The vocational expert testified that the claimant's past relevant work as a fast food worker was light, unskilled work; her work as a cashier was light, unskilled work; her work as a telephone solicitor was sedentary, semi-skilled work; her work as a deli cutter/slicer was light, unskilled work; her work as a general ledger bookkeeper was sedentary, skilled work; her work as a kitchen helper was medium, unskilled work; her work as a receptionist was sedentary, semi-skilled work; and her work as an escory [sic] driver was sedentary, unskilled work. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.

Id.

Magistrate Judge Seibert determined that the ALJ had not adequately developed and explained how he reached his decision that Platter had the RFC to perform her past relevant work. In particular he recommended that this case be remanded with directions to the ALJ to more specifically inquire into the demands of Platter's past relevant work in order to determine whether Platter had the RFC to do the work.

## VI. CONCLUSION

45

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Because the decision regarding Platter's ability to perform past relevant work "is an important and, in some instances, a controlling issue," (SSR 82-62 at *3), following a <u>de novo</u> review of the ALJ's analysis of Platter's ability to perform her past relevant work, the Court agrees with the recommendation of the magistrate judge to remand this case to the ALJ for further findings relevant to SSR 82-62. The Commissioner's objections do not raise any issues that were not thoroughly considered by Magistrate Judge Seibert in his R&R and the Court concludes that the R&R accurately reflects the law applicable to the facts and circumstances in this action. It, therefore,

1. **DENIES** the plaintiff's motion for Summary Judgment (Docket No. 15);

2. **DENIES** the defendant's motion for Summary Judgment (Docket No. 20);

3. **REMANDS** the case to the Commissioner for consideration pursuant to the recommendations contained in Magistrate Judge Seibert's Report and Recommendation; and

4. **DISMISSES** the case **WITH PREJUDICE** and **RETIRES** it from the docket of this Court.

It is so **ORDERED**.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

The Court directs the Clerk of Court to transmit copies of this Order to counsel of record.

DATED: March 25, 2012.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE